UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CRISTINA RIOS,                          )
                                        )
                    Plaintiff           )
                                        )
        v.                              )   CAUSE NO. 3:04-CV-276RM
                                        )
INDIANA UNIVERSITY, d/b/a               )
Indiana University South Bend, and      )
GWENDOLYN W. METTETAL                    )
                                        )
                    Defendant           )

OPINION AND ORDER

Cristina Rios brings claims against Indiana University South Bend (IUSB) and her supervisor, Interim Dean Gwendolyn Mettetal, alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The defendants seek summary judgment and, for the reasons that follow, the court grants the defendants' motion on all claims.

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving

1

party even when the record as a whole is viewed in the light most favorable to the nonmoving party. <u>Ritchie v. Glidden Company</u>, 242 F.3d 713, 720 (7th Cir. 2001). "[N]either the mere existence of some alleged factual dispute between the parties, nor the existence of some metaphysical doubt as to material facts is sufficient to defeat such a [summary judgment] motion." <u>Holtz v. J.J.B. Hilliard W. Lyons, Inc.</u>, 185 F.3d 732, 738 (7th Cir. 1999) (internal citations and quotations omitted).

## BACKGROUND

The court draws the following facts from the record—mostly from Dr. Rios's deposition and affidavit—and construes them in the light most favorable to Dr. Rios, the nonmoving party. Cristina Rios, a Mexican national of Hispanic ethnicity, accepted a position with IUSB's School of Education as associate professor in August 1999. Throughout the period covered by Dr. Rios's complaint, defendant Gwendolyn Mettetal was the interim dean of IUSB's School of Education and Dr. Rios's supervisor. Michele Eli was IUSB's director of student services. Patty Dees was IUSB's affirmative action officer.

Dr. Rios received positive evaluations through 2001, and Dean Mettetal recommended her for tenure on October 1, 2001. By the fall of 2001 Dr. Rios was associate dean of IUSB's School of Education. IUSB granted her tenure in April of 2002, effective July 2003.

Dr. Rios complains of a note, allegedly written to ridicule a former chancellor, that Dean Mettetal used to mock Dr. Rios's accent. The note, written

in crayon, read, "You . . . is my gud freend, but not yur stooents. Them not gud

et riting or spelin like me r. Yur pill, d. Danny Cowan, Ph.D. Fisicks rools." Dr.

Rios didn't mention this note in her deposition testimony, but she says in her

affidavit:

> Several times, when I would enter [Dean] Mettetal's office on School
> of Education business, after I said something like 'good morning,' she
> waved the note in my face, sometimes pointing to the word 'gud,'
> saying 'What?', pretending not to understand. On several occasions
> she used the note to humiliate me, asking if I could read or write
> while pointing to it or waving it. She has also laughed on several
> occasions when I spoke.

Dr. Rios's affidavit goes on to state that "[o]n several occasions," Dean

Mettetal and Ms. Eli referred to her ethnic background and accent, and that Dean

Mettetal and Marsha Heck (whose title the court has been unable to locate in the

record) "routinely" referred to her as "the ESL person" (presumably shorthand for

"English as a second language)". Dr. Rios says she asked Ms. Heck to stop

referring to her as "the ESL person," but Ms. Heck continued to do so. There is no

evidence Dr. Rios ever asked Dean Mettetal to stop using the term "ESL person."

Also, on as many as two occasions Ms. Eli laughed at Dr. Rios's accent.

In addition to this general mocking, Dr. Rios complains of two

confrontations she had  with Ms. Eli in October 2001. On October 15, Ms. Eli

confronted Dr. Rios in the school's hallway about the School of Education's

ongoing accreditation process, which Dr. Rios was overseeing in her capacity as

associate dean. Ms. Eli took Dr. Rios by the wrist and attempted to lead her into

her office. Dr. Rios released herself within 2 to 4 seconds, stating, "I don't want to go." Dr. Rios was not bruised, scratched, or physically hurt.

The following day, October 16, Dr. Rios went to Ms. Eli's office and told her, "What you did yesterday is not acceptable. Do not do it again." She then went to tell Dean Mettetal about the previous day's confrontation. Dean Mettetal was already talking with someone else in her office so Dr. Rios decided to return later. Between Dean Mettetal's office and the building's public hallway is a small sub-office for a secretary. While Dr. Rios was still in this sub-office space Ms. Eli arrived and insisted on talking with her. Ms. Eli said, "You're not leaving here until you talk to me," and blocked Dr. Rios's exit by placing her arm across the open doorway. When Ms. Eli realized that students in the hallway had taken notice of their argument she closed the door, continued to stand in front of it, and tried unsuccessfully to lock it. Dr. Rios protested, but was kept in the sub-office for several minutes. As Dr. Rios recalls the incident, Ms. Eli and Marcia Wiseman (Dean Mettetal's secretary) both laughed. During this time, Dr. Rios asked to be released from the office, finally threatening to call the police, which prompted Ms. Wiseman to summon Dean Mettetal from her office. Dean Mettetal offered to speak in her office, but Dr. Rios insisted on leaving. After she again said she would call the police Ms. Eli said, "Okay, okay," and let Dr. Rios leave. The entire incident took about fifteen to twenty minutes; no one touched Dr. Rios.

That same day, Dr. Rios filed an "informal complaint" with affirmative action officer Dees, who scheduled an informal hearing. The hearing was held two weeks

later, October 29, and included Dr. Rios, Dean Mettetal, Ms. Dees, Ms. Eli, and Ms. Wiseman. Dr. Rios characterized this meeting as an "inquisition" and a "concerted verbal barrage," but the record provides no details to support this characterization. On October 30, Ms. Dees sent an e-mail directing Ms. Eli and Dr. Rios to have no contact with one another until further notice.

Dr. Rios was admitted to St. Joseph Hospital in South Bend on October 31. She thought she had suffered a heart attack, and at her deposition she attributed her symptoms to work-related stress. The record isn't clear as to how long she remained in the hospital. Around November 26, Dr. Rios's doctor diagnosed her as having suffered two strokes (instead of a heart attack). He couldn't pinpoint exactly when the strokes occurred, but Dr. Rios speculated at her deposition that they occurred in late October 2001, shortly before she went to the hospital.

On November 12, 2001 Dean Mettetal sent Dr. Rios an e-mail asking how she felt and asking what her doctor said about resuming work. Dean Mettetal also added, "We're eager to have you back on campus." The e-mail then stated the importance of resolving the conflict between Dr. Rios and Ms. Eli, and outlined Dr. Rios's professional options at IUSB. These options included (1) working with Ms. Eli, either on her own or with a mediator (supplied by IUSB), to develop a collegial relationship; (2) requesting a transfer from the position of associate dean to full-time faculty (presumably where she wouldn't be required to work with Ms. Eli); or (3) filing a formal complaint with IUSB's affirmative action officer. IUSB took no disciplinary action against Ms. Eli or Dr. Rios for the October 15 and 16 incidents.

Dr. Rios returned to work at IUSB no later than November 12, 2001. Dr. Rios says that upon her return, IUSB and Dean Mettetal discriminated against her in several ways in retaliation for filing her informal complaint with Ms. Dees regarding her October 15th and 16th confrontations with Ms. Eli. Dean Mettetal required her, as associate dean, to take on responsibilities associated with IUSB's compliance with the Americans with Disabilities Act, a job partly performed by someone Dr. Rios refers to as a "janitor." Dean Mettetal explained that because the janitor worked only until noon, Dr. Rios would need to monitor the building in the afternoons to ensure there were no obstacles in the way of disabled students. She also instructed Dr. Rios to measure certain doorways to ensure compliance with ADA regulations.

Dean Mettetal also asked Dr. Rios, as associate dean, to set an example for the rest of the faculty by helping clean up the meeting room after faculty meetings. She also once asked Dr. Rios to "pick up some apples," and asked her to buy a coffeepot for the School of Education for which she would then be reimbursed. Tasks such as monitoring ADA compliance, cleaning up after meetings, picking up apples and purchasing a coffeepot weren't part of the associate dean's job description Dr. Rios received when she was hired.

Dean Mettetal also claimed the school's accreditation was at risk and reassigned the task of completing the "Unit Assessment System"—a task associated with the accreditation process—to a white male professor, Michael Pickle. Dr. Rios has also placed in the record a letter from Dean Mettetal to her

6

stating that responsibility for completing the unit assessment system was being transferred to the School of Education's assessment committee, of which Dr. Rios was a member. Dr. Rios also says that Dean Mettetal assigned the completion of the school's overall accreditation process to four individuals: Dr. Susan Cress, Dr. Janet Shaw, Dr. Dan Holm and an unnamed outside consultant.

On December 17, Dr. Rios filed a formal complaint with IUSB's Affirmative Action Office. Ms. Dees investigated Dr. Rios's charges before finding no discrimination based on ethnicity or national origin, nor any retaliation. Ms. Dees reported these findings to Dr. Rios in a letter dated January 9, 2002.

By December 20, 2001, Dr. Rios says she had reached the "point of total frustration." She began corresponding with IUSB Chancellor Kenneth Perrin about her dissatisfaction with working under Dean Mettetal. Dr. Rios and Chancellor Perrin met on January 23, 2002, and Dr. Rios accepted Chancellor Perrin's offer to transfer to another administrative position: IUSB's special liaison to the Hispanic community in the Michiana area. Dr. Rios resigned as associate dean of the School of Education and assumed her new responsibilities in the chancellor's office. In a January 28, 2002 letter, Chancellor Perrin limited the duration of Dr. Rios's time in the liaison position by stating: "In this new and important role, you will report directly to me for the balance of my tenure." Although the new liaison position wasn't in her area of special expertise—which was accreditation—Dr. Rios enjoyed her new job and continued to be paid the same as she had been during her time as Associate dean. Because it was an administrative position, the liaison

7

job paid Dr. Rios for all twelve months of the year, as opposed to the ten months of pay full-time teaching faculty received at IUSB. Chancellor Perrin's tenure ended in June 2002, and Dr. Rios returned to the School of Education the next day as a full-time, tenured faculty member where she was then paid on a ten-month basis (for the August through May school year).

Dr. Rios says she was denied the opportunity to teach courses in 2002 and 2003 in the School of Education's graduate leadership program in favor of untenured or adjunct professors, and that several new administrative positions were created and available. She says she was qualified for these positions, but was denied promotion. These positions, some of which were filled by "lecturers" or "adjuncts", were made available in spring or summer 2002 (the record is conflicted), and March and April 2003. Dr. Rios says some of the people who received these administrative positions were less qualified than she, but she provides no facts from which the court can evaluate this conclusion. The record contains no evidence that Dr. Rios formally applied for any specific position beyond her general affidavit statement that she made "repeated requests . . . to be returned to a 12 month and/or administrative position."

IUSB professors are evaluated each year. In Dr. Rios's evaluation for 2002, Dean Mettetal indicated that Dr. Rios needed improvement in the areas of teaching and service. This evaluation was in contrast to a letter dated October 1, 2001 in which Dean Mettetal recommended Dr. Rios for tenure and described her teaching as "satisfactory" and her service as "good." Dr. Rios says she received

8

excellent evaluations for all the other years she has taught at IUSB. It appears that 2002 was the only year in which Dean Mettetal completed Dr. Rios's evaluation. Dr. Rios cites several letters of recommendation and evaluations written by other professors and administrators that contain positive comments about her work over the years from 1999 to 2003.

Dr. Rios filed two formal complaints in March 2003 with Ms. Dees. One complaint addressed her concerns about not getting selected for various administrative positions within the School of Education. She particularly complained about not being chosen as the coordinator of the educational leadership program, a graduate program for aspiring school principals. Dean Mettetal awarded the position to an adjunct professor who had helped design IUSB's educational leadership program eight years earlier, and who had taught in the program almost every semester since that time with good student evaluations. The other complaint questioned the 2002 evaluation in which Dean Mettetal said Dr. Rios needed improvement in teaching and service.

Ms. Dees investigated these charges of discrimination and retaliation. In an undated report Ms. Dees found there had been no unlawful discrimination because Dean Mettetal had valid nondiscriminatory reasons for not selecting Dr. Rios for certain administrative positions and for stating that Dr. Rios's teaching and service needed improvement in 2002. Dean Mettetal's reasons included Dr. Rios's student evaluation scores (she placed in the bottom half of the education faculty), lack of feedback given to students during courses, lack of participation

9

in student-faculty advising sessions, lack of involvement in curriculum revisions ( she attended 2 of 10 faculty meetings from November 2001 through May 2003), and that Dr. Rios never contacted Dean Mettetal about applying for the administrative positions that became available in 2002.

Ms. Dees formally communicated her findings to Dr. Rios in a letter dated May 27, 2003. Dr. Rios already had filed a charge of discrimination with the EEOC and the Indiana Civil Rights Commission on April 14, 2003. In her charge Dr. Rios alleged a hostile working environment, constructive resignation [discharge], denial of access to new positions within the School of Education, and retaliation for filing complaints with IUSB's affirmative action officer. Soon after Dr. Rios filed her EEOC charge, Dean Mettetal laterally transferred her out of the educational leadership program and assigned her to a different program (not specified in the record) within the School of Education. Dr. Rios received her Notice of Rights on January 28, 2004 and timely filed this suit on April 27, 2004.

DISCUSSION

*Statute of Limitations*

Dr. Rios presents claims under both Title VII (42 U.S.C. § 2000e *et seq.*) and 42 U.S.C. § 1981 for a hostile work environment, constructive discharge, failure to promote, and unlawful retaliation. *See* <u>Dandy v. United Parcel Service , Inc.</u>, 388 F.3d 263, 269 (7th Cir. 2004).

IUSB asserts that Dr. Rios's Title VII claims are time barred because she filed her EEOC charge on April 14, 2003, and at least some of the events about which she complains took place more than 300 days before that. Dr. Rios responds by saying that her claims represent a continuing violation, which she asserted in her EEOC charge.

Title VII's 300-day statute of limitations doesn't apply to Dr. Rios's claims under § 1981. Because Dr. Rios's § 1981 claims are properly characterized as post-formation contract claims, they are subject to the four-year federal statute of limitations contained in 28 U.S.C. § 1658(a). *See* Dandy v. United Parcel Service, Inc., 388 F.3d at 269. Because the merits of all of Dr. Rios's claims are assessed under the same framework whether brought under Title VII or § 1981, and because there is no dispute that her claims are not barred by § 1981's four-year limitations period, the court need not address IUSB's statute of limitations defense. Melendez v. Ill. Bell Telephone Co., 79 F.3d 661,669 (7th Cir. 1996) (substantive standards governing liability for § 1981 claims and Title VII disparate treatment claims are identical).[1] The court addresses all of Dr. Rios's claims under the four-year limitations period applicable to § 1981, so it considers events that occurred after April 2000.

*Hostile Environment*

---

[1] Dean Mettetal is not a proper defendant under Title VII because she is not an "employer" as defined in 42 U.S.C. § 2000e(b). She may be liable individually under 42 U.S.C. § 1981.

11

Title VII, 42 U.S.C. § 2000e-2(a)(1), and 42 U.S.C. § 1981 both provide redress for victims of intentional racial discrimination, including subjection to a hostile work environment. *See* Dandy v. United Parcel Serv., Inc., 388 F.3d at 269. To survive summary judgment on a hostile work environment claim against an employer under either Title VII or § 1981, a plaintiff must point to evidence from which a reasonable jury could conclude that: "(1) [s]he was subject to unwelcome harassment; (2) the harassment was based upon race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." Smith v. Northeastern Ill. Univ., 388 F.3d 559, 566 (7th Cir. 2004) (citing Williams v. Waste Mgmt. of Ill., 361 F.3d 1021, 1029 (7th Cir. 2004)). A plaintiff also must demonstrate that the work environment was both subjectively and objectively offensive. Robinson v. Sappington, 351 F.3d 317, 329 (7th Cir. 2003).

A court looks to all the circumstances when evaluating the severity or pervasiveness of the alleged conduct. Smith v. Northeastern Ill. Univ., 388 F.3d at 566. These circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Russell v. Bd. of Trustees of Univ. of Ill. at Chicago, 243 F.3d 336, 343 (7th Cir. 2001). When harassment culminates in a tangible adverse employment action, employers are vicariously liable for a racially hostile work

12

environment created by a supervisor. <u>Cerros v. Steel Technologies, Inc.</u>, 398 F.3d 944, 951 (7th Cir. 2005). When harassment by a supervisor does not result in a tangible adverse employment action, the employer may assert an affirmative defense by establishing "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Id.</u>, at 951-952 (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998)). Employers are liable for harassment perpetrated by co-workers only when the employer has "'been negligent in either discovering or remedying the harassment.'" <u>Cerros v. Steel Technologies, Inc.</u>, 398 F.3d at 952 (quoting <u>Perry v. Harris Chernin, Inc.</u>, 126 F.3d1027, 1032 (7th Cir. 1998)).

To support her hostile work environment claim, Dr. Rios describes several examples of perceived racial harassment. She says that a co-worker, Ms. Eli, laughed at her accent on one or two occasions. She further states that on several occasions both Dean Mettetal (her immediate supervisor), and Ms. Eli "referred" to her ethnic background. But there is no evidence that the "references" made by Dean Mettetal or Ms. Eli were anything more than references to her national origin, as opposed to objectively offensive remarks motivated by race. Dean Mettetal and another co-worker, Ms. Heck, "routinely" referred to her as the "ESL person," and Ms. Heck persisted in using that term after Dr. Rios asked her to

13

stop. Dr. Rios never asked Dean Mettetal to stop, nor did she complain to affirmative action officer Dees or anyone else at IUSB about these references.

Dr. Rios also describes the October 2001 confrontations between her and Ms. Eli when Ms. Eli demanded to speak with her about the accreditation process. On October 15, Ms. Eli grabbed Dr. Rios by the arm for a few seconds without physical injury, and on October 16, Ms. Eli confined Dr. Rios in an office for fifteen to twenty minutes[2] without touching her or locking the door. Dr. Rios lodged an informal complaint about these incidents with Ms. Dees, who set up a meeting to attempt to resolve the dispute. Dr. Rios declined IUSB's offer of a mediator to help Dr. Rios work out her differences with Ms. Eli. Most importantly, there is no evidence in the record that either October 2001 confrontation was motivated by racial prejudice or was anything more than a dispute over the school's progress toward renewed accreditation.

There is also evidence that Dean Mettetal asked Dr. Rios to perform some tasks that were not explicitly listed in her official job description as associate dean. These included asking that she set an example for the rest of the faculty by helping clean up rooms after meetings, that she assist in purchasing supplies such as a coffee maker (for which she would then be reimbursed), and that she assume responsibility for ensuring the school's compliance with the Americans

---

[2] Other witnesses say this was much shorter period of time, but for summary judgment purposes the court accepts Dr. Rios's recollection of events.

with Disabilities Act. Dr. Rios speculates in her affidavit that Dean Mettetal asked her to do these tasks as a form of race-based harassment.

The evidence could also support a finding that "several times" Dean Mettetal used a copy of a note, hand-written in crayon, containing several obvious misspelling and grammatical errors to mock Dr. Rios's Mexican accent. The note originally had been written to mock a former IUSB chancellor. Dr. Rios says she found the note and Dean Mettetal's use of it humiliating, but there is no evidence she ever asked Dean Mettetal to stop this or that she ever complained to anyone at IUSB about Dean Mettetal's note. Indeed, the record contains no evidence that anyone other than the two of them knew that Dean Mettetal used the note to mock Dr. Rios's accent.

No reasonable trier of fact could find that the events related by Dr. Rios meet the threshold for a hostile work environment claim. Most of the "harassment" she describes lacks any nexus in the record to racial animus. Two types of harassing behavior she describes might be found inherently racial: Dean Mettetal's and Ms. Heck's  references to her as the "ESL person," and Dean Mettetal's mocking use of the note. But even these incidents are insufficient.

The references to Dr. Rios as the "ESL person" are not as objectively offensive as more obvious ethnic slurs. *Cf.* Cerros v. Steel Technologies, Inc. 398 F.3d 944, 951 (7th Cir. 2005) (quoting Torres v. Pisano, 116 F.3d 625, 632- 633 (2d Cir.1997)) ("[A] reasonable Puerto Rican would find a workplace in which her boss repeatedly called her a 'dumb spic' and told her that she should stay home,

go on welfare, and collect food stamps like the rest of the 'spics' to be hostile."). Dr. Rios says Dean Mettetal and Ms. Heck "routinely" called her by this title, and that Ms. Heck refused to stop after Dr. Rios confronted her.

The existence of an actionable hostile work environment depends on "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Russell v. Bd. of Trustees of Univ. of Ill. at Chicago, 243 F.3d at 343 (7th Cir. 2001). If there were evidence that "routinely" meant several times every day, this "ESL person" label—though relatively mild in content—might have created an objectively hostile working environment because of its sheer pervasiveness. *See* Smith v. Northeastern Ill. Univ., 388 F.3d at 566 (severe or pervasive standard). But the summary judgment record would not allow such a finding. The conduct wasn't extremely severe in its content or physically threatening, and didn't unreasonably interfere with Dr. Rios's work performance.[3] Although this name calling may have humiliated Dr. Rios, the weight of the factors listed in Russell, 243 F.3d at 343, forecloses the possibility of finding an actionably hostile work environment. On this unspecific record no reasonable jury would be in a position to find that the use of the relatively mild "ESL person" label was so pervasive that it created a

---

[3] Dr. Rios speculates that her hospitalization and stroke were linked to her confrontation with Ms. Eli over the accreditation process; she doesn't tie her health problems to any of these other instances of perceived harassment. There is no medical evidence that her stroke was caused by her work environment.

16

work environment that was "hellish." *See* Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995).

Even if Dr. Rios could show a actionably hostile work environment, the record supplies no evidentiary basis for employer liability based on Ms. Heck's conduct. Dr. Rios never complained to anyone about Ms. Heck's name calling except to Ms. Heck herself, though she knew the proper channels for a complaint flowed through Ms. Dees's office. She doesn't argue that IUSB knew or should have known about Ms. Heck's use of the term "ESL person," so IUSB cannot be said to have been negligent in discovering or remedying the harassment and is not liable. Cerros v. Steel Technologies, Inc., 398 F.3d at 952.

There is no basis for either IUSB or Dean Mettetal to be held liable based on Dean Mettetal's use of the term "ESL person," or her mocking use of the note. For the same reasons that Ms. Heck's use of the term "ESL person" did not create a hostile work environment, Dean Mettetal's use of the term also does not support a claim. Even if Dean Mettetal's name calling or use of the note rose to the level of actionable harassment, Dr. Rios suffered no adverse employment action, so IUSB would be shielded by the defense outlined in Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765 ("(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.").

IUSB has established the two elements of this affirmative defense. First, the record shows that whenever Dr. Rios complained about racial discrimination to IUSB's affirmative action officer, Ms. Dees, her complaints were investigated reasonably promptly and thoroughly. Ms. Dees's conclusions that no racial discrimination had occurred were amply supported in her reports. Second, Dr. Rios makes no suggestion that she ever complained to Ms. Dees (or anyone else at IUSB) about Dean Mettetal's use of the term "ESL person" or about her mocking use of the note. By neglecting to complain about the most objectively offensive instances of race-based harassment contained in the record Dr. Rios "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765. IUSB cannot be made liable for Dean Mettetal's allegedly harassing conduct.

Dr. Rios's § 1981 harassment claim against Dean Mettetal individually presents a separate question. The court assesses each of the harassment factors set forth in Russell v. Bd. of Trustees of Univ. of Ill. at Chicago, 243 F.3d at 343 (frequency, severity, whether physically threatening or humiliating, whether unreasonably interfering with employee's work performance).

As to frequency, Dr. Rios says only that Dean Mettetal used the note to mock her "several times" by pointing to it or waving it at her, pretending not to understand what she was saying, and asking whether she could read or write. Because Dr. Rios's complaint covers a period of several years, "several times",

18

without more, could mean that this happened no more than once per year. Nothing in the summary judgment record would allow a factfinder to determine the actual frequency with which Dean Mettetal mocked Dr. Rios with the note.

The note and Dean Mettetal's accompanying mockery were more severe than the use of the term "ESL person," but this conduct is still appreciably less severe than the use of objectively offensive racial slurs or commands to return to one's country of origin. *Cf*. Cerros v. Steel Technologies, Inc. 398 F.3d 944, 950-951 (7th Cir. 2005) (discussing workplace graffiti using terms "spic", "wetback", and commanding such persons to "go back to Mexico"). Dean Mettetal's conduct was not physically threatening, though Dr. Rios says it was humiliating. While the conduct reasonably could be considered humiliating, there is no evidence that it unreasonably interfered with Dr. Rios's work performance.

When taken as a whole, the lack of evidence as to the frequency, the moderate severity, the lack of physical threats (or any threats at all), and the lack of evidence that Dean Mettetal's conduct unreasonably interfered with Dr. Rios's work performance override the potentially humiliating nature of the mockery. No reasonable jury could find Dean Mettetal personally liable under § 1981 for subjecting Dr. Rios's to an actionably hostile work environment. *Cf*. Durkin v. City of Chicago, 341 F.3d 606, 609-610, 613 (7th Cir. 2003) (where female plaintiff police trainee suffered months of disgusting, sexually-explicit ridicule and indecent conduct from her shooting instructor and fellow trainees, yet court of appeals determined that the "boorish conduct and unexplained animosities" did

not rise to the level of a hostile work environment under Title VII); <u>Baskerville v. Culligan Int'l Co.</u>, 50 F.3d 428, 430 (7th Cir. 1995) (holding that nine incidents over seven months didn't add up to a hostile work environment even when male manager told secretary she was a "pretty girl" and later suggested that "all pretty girls run around naked," grunted at the sight of her in a leather skirt, and made a hand gesture to her suggesting masturbation, among other inappropriate and unwanted advances). Not all conduct that should not occur in a workplace is actionable.

<i>Constructive Discharge</i>

Dr. Rios also claims IUSB constructively discharged her from her associate dean position. An actionable hostile environment claim requires sufficient severity or pervasiveness, but "a hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." <u>Pennsylvania State Police v. Suders</u>, 124 S. Ct. 2342, 2354, (2004). <i>Cf.</i> <u>Rooney v. Koch Air, LLC</u>, 410 F.3d 376, 383 (7th Cir. 2005) (citing <u>Taylor v. Western & Southern Life Ins. Co.</u>, 966 F.2d 1188, 1191 (7th Cir.1992)) (finding constructive discharge where the employee's boss consistently made racial comments and on one occasion held a gun to his head, took a photo, and later showed it at a staff meeting while making racial jokes); <u>Brooms v. Regal Tube Co.</u>, 881 F.2d 412, 417 (7th Cir.1989) (finding constructive discharge where the

20

employee's human resource manager repeatedly showed her racist pornographic photos and made threatening comments to her including a threat to kill her).

Because Dr. Rios hasn't met the threshold for a hostile environment claim, it follows that she is not able to maintain a claim for constructive discharge. She voluntarily resigned her position as associate dean of the School of Education to become IUSB's liaison to the Hispanic community in Michiana.

*Failure To Promote*

Dr. Rios's complaint alleges that IUSB refused to consider her for promotion to administrative positions that became available in August 2002 and in the spring or summer of 2003. Her brief in response to the defendants' summary judgment motion tacitly concedes that she cannot prevail on this claim. Her brief makes no attempt to discuss her failure to promote claim or to challenge the defendants' arguments in favor of summary judgment. She states only that "this case presents jury-worthy issues of hostile environment, constructive discharge and retaliation." By not including her failure to promote claim in this list of "jury-worthy issues," and by leaving that claim unaddressed in her brief, Dr. Rios has abandoned it. The defendants are entitled to summary judgment on the failure to promote claim. *See* Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005) ("Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence

it has that would convince a trier of fact to accepts its version of the events.")
(quotations and citations omitted).


*Retaliation*

Dr. Rios alleges that IUSB engaged in acts of retaliation following her
informal complaints of discrimination in the fall of 2001, March 2003, and
following the filing of her EEOC charge in April 2003.

A plaintiff may overcome a summary judgment motion on her retaliation
claim by using the direct or indirect method of proof. Under the direct method, she
must produce direct or circumstantial evidence that she suffered an adverse
employment action because she had engaged in a protected activity. Hottenroth
v. Village of Slinger, 388 F.3d 1015, 1028 (7th Cir. 2004). Under the indirect,
burden-shifting method, a plaintiff must establish the four elements of a
McDonnell Douglas prima facie case: (1) she engaged in statutorily protected
activity, (2) she performed her job according to her employer's expectations, (3) she
suffered a materially adverse employment action, and (4) she was treated less
favorably than similarly situated employees who did not engage in statutorily
protected activity. Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir.
2002).

Dr. Rios does not attempt to establish the elements of a prima facie case
under the McDonnell Douglas framework, so she must proceed under the direct
method of proof by pointing to direct or circumstantial evidence of retaliation. *See*

22

Beamon v. Marshall & Ilsley Trust Co., 411 F.3d 854, 862 (7th Cir. 2005) ("unsupported and undeveloped arguments are waived."). Her brief sets forth a single concrete fact in support of her retaliation claim—that IUSB did not discipline Ms. Eli for her October 2001 confrontations with Dr. Rios about the accreditation process—the rest of Dr. Rios's argument relies on conclusions not supported by any citation to the record. Even when the court considers all of the evidence in the record, Dr. Rios cannot prevail on her retaliation claim.

Dr. Rios claims in her affidavit that members of the IUSB staff engaged in a "campaign against [her] of character assassination, defamation, and conscious effort to injure [her] academic standing and career." The court's review of the record suggests four possible specific adverse employment actions upon which her claim is based: 1) a hostile work environment, 2) her constructive discharge from her position as associate dean, 3) IUSB's failure to promote her to new administrative positions, and 4) the receipt of a negative evaluation from Dean Mettetal.

None of these four events suffices to raise a genuine factual issue as to whether Dr. Rios suffered an adverse employment action. For reasons already discussed above, there is not enough evidence for a jury to find either a hostile work environment or a constructive discharge.

A failure to promote is an adverse employment action, Volovsek v. Wisconsin Dep't of Agriculture, Trade, & Consumer Protection, 344 F.3d 680, 688 (7th Cir. 2003), but the summary judgment record doesn't have enough sufficient evidence

to persuade a reasonable jury that IUSB unlawfully failed to promote Dr. Rios. Her brief lists the claims for which she says there are genuine issues of material fact, and she doesn't include "failure to promote" in that list, and she didn't attempt to establish the elements of a failure to promote claim anywhere in her brief. Based on the record and the briefs in this case, no reasonable jury could find that IUSB unlawfully failed to promote Dr. Rios.

The fourth potential adverse employment action is an allegedly negative evaluation Dean Mettetal gave Dr. Rios in 2002. But "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions." Grube v. Lau Indus., Inc., 257 F.3d 723, 729 (7th Cir. 2001). *See also* Herron v. Daimler Chrysler Corp., 388 F.3d 293, 300 n.1 (7th Cir. 2004) ("An adverse employment action is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' However, a negative performance evaluation is usually not labeled an adverse employment action." (quoting Burlington Indus. Inc. v. Ellerth, 524 U.S. at 761) (internal citation omitted)).

Assuming that Dean Mettetal's 2002 evaluation of Dr. Rios was negative, the record contains no evidence that any tangible adverse employment action accompanied the evaluation. Dr. Rios retained her job as a full time faculty member, and her promotion to tenured status took effect as scheduled in 2003. *Cf.* Herron v. Daimler Chrysler Corp., 388 F.3d at 300 (employee's negative

24

performance evaluation was an adverse employment action when it resulted in the automatic denial of a pay raise).

Because she cannot show that she suffered an adverse employment action, Dr. Rios's retaliation claim cannot survive summary judgment. *See* <u>Hottenroth v. Village of Slinger</u>, 388 F.3d at 1028 (plaintiff must show she suffered an adverse employment action because of her statutorily protected activity).

CONCLUSION

For the reasons stated in this order the court GRANTS the defendants' motion for summary judgment [docket no. 35] as to all claims. The clerk shall enter judgment in favor of the defendants. The final pretrial conference and trial, along with all other deadlines which had been set in this case are VACATED.

Both the plaintiff and the defendants filed motions to strike portions of the summary judgment record. The defendants' motion is moot because they were still entitled to summary judgment even when the court considered all the evidence submitted by the plaintiff. The plaintiff's motion is mostly moot because the court's summary judgment ruling relies on only two of the documents to which she objected: defendants' exhibits 9 and 18. These two documents are reports and findings from Ms. Dees's investigations of formal complaints Dr. Rios filed with IUSB's Affirmative Action Office. Ms. Dees's supplemental declaration authenticates both documents and identifies herself as their author. Her declaration also establishes both as records which the Affirmative Action Office

25

generated and kept in the ordinary course of its business, so Dr. Rios's hearsay objections are not persuasive. FED. R. EVID. 803(6). The defendants' motion to strike [docket no. 37] is DENIED AS MOOT. The plaintiff's motion to strike [docket no. 32] is DENIED as to defendants' exhibits 9 and 18, and is DENIED AS MOOT in all other respects.

The plaintiff also filed a motion to supplement the record to include late breaking discovery requests served by the defendants upon two of her prospective employers. She says this evidence supports her Title VII claims and is relevant to her potential recovery of damages. The evidence of these discovery requests does not affect the merits of the plaintiff's Title VII claims, and the issue of damages is now moot in light of today's summary judgment ruling. Accordingly, the plaintiff's motion to supplement the record [docket no. 43] is DENIED AS MOOT.

SO ORDERED.

ENTERED: August 9, 2005

/s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

26